Microsoft Office Word Document MSWordDoc Word.Document.8 Okay, the next argued case is number 17-2042, Parallel Networks Licensing against IBM. Mr. Cawley. Thank you, Your Honor. Good morning, and may it please the Court. The trial court erred in this case in granting summary judgment as to all of the claims in suit that are before the Court today. Specifically, the trial court granted a summary judgment of no direct infringement by IBM, found on summary judgment that IBM was not liable for inducing infringement, and finally found the saying no liability by IBM for contributory infringement. We believe that each of those rulings was error on summary judgment and ask this Court to reverse and remand for trial in the merits. Is inducement directly related to the holding on direct infringement? That's the basis for it, that there was no direct infringement, hence no inducement? No, it wasn't, Your Honor. And I guess maybe the best way for me to answer that question is to first explain the Court's ruling on direct infringement. The district court fundamentally erred in considering IBM's direct infringement essentially by converting machine-readable medium apparatus claims into method claims, and therefore requiring the performance of all of the steps set forth in the relevant machine-readable claims. For example, Representative Claim 20 of the 554 patent does contain a number of steps, but the preamble to that claim says that the claim covers a machine-readable medium containing instructions that, when executed, cause a computer to implement certain steps. The district court in its summary judgment order, however, reasoned that one of those steps is that certain features of the system select what are called page servers, computers to which to efficiently send information. And because there were not a plurality of those servers to be selected among at the time of sale, that step couldn't be performed. The court therefore reasoned there's no infringement. The problem with that analysis is, again, it essentially treats that claim as a method claim, finding that there can be no infringement if the court found on the summary judgment evidence that that step was not performed. But to win, you have to argue that the step was ultimately performed. The way reasonable damage is we would, but the law, I believe, is clear from MDOCS all the way back to fantasy sports that there is infringement if the claim is drafted to cover a machine-readable medium with certain instructions to do things. Therefore, Your Honor, I think that at least the abstract answer to Your Honor's question is, if we had a situation where IBM sold the medium, it has instructions on it to perform all those steps, but nobody did it, you still have direct infringement. But they say that it turns on, it isn't that the instructions say, this is what you should do, that the instructions are general and broad, and you could perform all sorts of non-infringing steps without the plurality of the server. They do say that. How do you overturn that? But in FIDGEM, the user participation was minimal at best. Here, it appears that the participation by the user would be quite extensive. I mean, the participant would have to figure out how to do this, how to supply this missing step. There's nothing there that tells them how to do it. Well, there is evidence in the summary judgment record that tells them how to do it, yes. But it is true, I believe, that the participation of the customer is more robust in this case than it would have been in FINJAM. Fantasy sports? Maybe not. In fantasy sports, you had the ability in that software to customize extra points that more than 1,000 players in the National Football League might earn in the operation of that fantasy sports software. That could be substantial participation by the customer. So, the first error that we submit that you find in the district court's analysis of direct infringement, and indeed, the only basis that the district court gave for a finding of direct infringement is that because at the time of sale, there was not a plurality of page servers, that the step of choosing a page server could not be carried out. That simply is a misapprehension of the law of a claim drafted in terms of a machine-readable medium. And I would respectfully submit that there is no case that holds that because some non-infringing implementations are possible, or because the customer eventually participates in the implementation, that that obviates the infringement that results from that sale. IBM has advanced in the course of briefing this case some additional arguments that they did not make below. We believe those, of course, are waived. The first is that there are no routing instructions as required by the preamble. That argument was not made below, and the summary judgment evidence shows that the WAS software includes instructions to route to page servers, including specific references to the portions of the source code that accomplish that routing. IBM contends, again, after its submissions on summary judgment below, contends for the first time in this appeal that there were no instructions to generate dynamic web pages from separate data sources. To the contrary, there are specific drawings in IBM's own documents instructing its customers how to use the accused software to build page servers that obtain dynamic information from data sources. And finally, IBM argues... To obtain information, but not from a plurality of page servers. Well, it teaches a... It doesn't teach that other step. And if it does, show me where it teaches that. Yes, yes, your honor. How to build or establish the step that takes you to a plurality of page servers. Sir. We can start on appendix 13-172. Go ahead. That's a drawing, figure A-1, that's described as a complex topology. It almost could be taken directly from figure 4 in the patent. It depicts a customer computer making a request which is routed to a server, a web server. That web server in the lower right-hand corner has a portion of software that IBM refers to as a plug-in. The patent refers to as a router, which makes intelligent decisions about where and under what circumstances to route that request to what we see labeled in this drawing as application network. And as you can see, those plug-ins at the web servers route the request per the intelligence in that plug-in to a plurality of what the patent calls page servers. And then you see that eventually those page servers can read or can receive dynamic data from the database server 1. This drawing is followed on the subsequent approximately 10 pages by a detailed description of the advantages of this system, including managing requests for dynamic content and doing so from two clusters that consist of three application servers. I'm reading now from the upper part of page 13-173. This document goes on to explain how this system is to be installed by the customer, how it is to be tested by the customer. And what portion is devoted to the plurality of page servers? Well, let's see. The drawing lays out the topology and the creation of the application servers, which the patent calls page servers, is specifically covered on page 13-177. So what I'm looking at are this web 1A, web 1B. You're saying that those web pages are the page servers? Yes, sir. They're not pages. They are servers themselves that generate... But they're not page servers. Yes, they are page servers. I mean, the patent calls them page servers. IBM doesn't use that name. You're saying a web page and a page server is the same thing? Is that what you're... No, Your Honor. The web page is what would be produced by the page server and could be viewed in a web browser. The page server is a computer. It's a computer that is used as a server. The request at the customer's computer at the very beginning on the far left goes through to a set of computers, the web servers. The web servers have software that IBM calls the plug-in, and that plug-in is able to intelligently route that request to the computer or page server that is most available and is most efficient in responding to that request. If appropriate... It seems you're missing a step. The patents here start out with the user contacting or going to a web page. The web page, once it's asked by the user for specific content, then the web goes into this plurality of page servers, selects one of them, the one that's not busy or the one that has enough memory. And then the page server itself goes out and gets content and devotes these dynamic pages. So the dynamic pages is different from the web page. Well, they're all web pages, Your Honor. Well, yes, but we're looking at the... And remember, what's being sent from you and I, the customer, to the web server? The first thing that goes through is a request. We're not sending a web page. We're sending a request for a web page. That web server, although it's capable probably of making a web page, basically what it's doing in this system is using the plug-in, i.e. the dispatcher, to intelligently distribute that request, again. The page server compiles the page, and in some instances, it may be desirable to include dynamic data, such as sports scores, stock indications, weather forecasts, in the page that the page server is creating. Once that's done by the page server, that page is then routed back to the web server and to you and I. Okay. Let's hear from the other side. We'll save your rebuttal time, Mr. Crowley. Thank you, Your Honor. Mr. DeMarais. Thank you, Your Honor. May it please the Court, John DeMarais for IBM. Let me start by saying every claim in this case requires at least two things. I'm going to talk about others, but at least two. One is instructions for routing web pages and a plurality of servers, page servers, as you were just discussing. Mr. Crowley just argued that IBM waived the argument about the routing instructions. That is incorrect. If you look at IBM's motion for summary judgment, the very first argument, the very first heading, was devoted to routing instructions. In fact, the Court ruled on that argument, and the Court ruled at Appendix 7. It's a quote from the District Court. The alleged identification of instructions is wholly inadequate. He's talking about Parallel Network's experts' identification of instructions. The Court said the alleged identification of instructions is wholly inadequate, consisting of an incomprehensible 200-plus page spreadsheet with nothing more than claim language and directory locations of source code files. So the District Court not only—we didn't not only waive the argument, we made it as our first argument, and the District Court ruled on it and said their evidence was insufficient to overcome summary judgment. For that reason alone, this should be affirmed. They have not identified that our product, IBM's product, as sold includes the routing instructions, which is a claim element. They don't even deny it's a claim element. The second claim element, the plurality of servers, the District Court also ruled. The District Court held that there's no dispute of fact that the product as sold, WAS, we call it WAS, WAS as sold by IBM does not have the claimed plurality of page servers. Parallel Network's argument is that the software is capable, with customer help and installation and IT people, of creating a plurality of page servers. But that's not what the claim requires. I took his argument to be more than just capable. I mean, the brief, that's the argument, that it's capable. But when we're pointed to 13-172, that particular graph, I don't see there where there's a web page that's contacting a plurality of page servers. Am I looking at this correctly? And that's what I do see when I look at Figure 4 of the patent. Yes, Your Honor, and I think the conflation here is, I agree with Your Honor, the conflation here is they're taking the IBM application servers, which are not page servers, they're not web page servers, they're application servers for a whole manner of applications. Banking transactions, FedEx tracking their packages, companies doing logic on their infrastructure, they're calling these application servers page servers. The patent in this case was about generating web pages. The WAS product that IBM sells is not a web page generation product. It's a product that helps businesses run their businesses, either tracking FedEx packages or doing banking transactions, etc. So it's wrong to call those application servers page servers. But even if you get beyond that, the district court found that the required claim limitation of a plurality of things called page servers doesn't exist in the code as sold. It is actually quite complicated to use that code to even make a plurality. Did the court actually make that finding? Or was it that there was a bunch of data presented with the statement that it's in here somewhere, this limitation? On this particular issue, the court said in Appendix 7 that there's no dispute of fact that WAS as sold by IBM does not contain a plurality of page servers. And the court was weighing in on the evidence from their expert and ours and saying that there was no dispute. In fact, the court says in Appendix 7, quote, the fact that the accused products may be used to create application servers does not mean the products as sold include application servers as required by the claims. So right here we have two reasons that this should be affirmed summarily, really, because there's no evidence to the contrary. Our first argument was that the product doesn't include the routing instructions. The court looked at their experts' alleged identification of routing instructions and said it's not sufficient. Secondarily, the court said there isn't a plurality of page servers. So for those two independent reasons, but I do want to talk about a third reason. But your opponent is saying there wasn't a plurality of page servers, but still the software is capable of producing a plurality. The WAS system is capable of producing a plurality. Not by itself. And this is what distinguishes all the cases they're relying on. To what extent does, so now you have a user that I guess is supplying this limitation here, a plurality of page servers. Yes. What's the effort required of that user in order to get to that point? Well, it's huge. And this is what distinguishes all of the cases, Fantasy Sports and Amdocs and all of them. In order for a deployment of WAS to lead to a plurality of page servers, first of all you need an IT team. And you need other hardware because the application servers are on separate hardware. And then you have to install on that separate piece of hardware the code and then set it up and configure it and turn it into an application server. Then you have one. Then you have to decide as a user that I want a second one. You have to get another piece of hardware. You have to install software. You have to get it set up. This is what IT professionals have to do. There is not on the WAS medium that is sold by IBM a plurality of these things. The district court found that and that was a factual finding. And their expert did not take a contrary view. Their expert said it's capable of being made that, but it isn't that one. And your argument applies both to the method claim and the medium claim. Absolutely, Your Honor. The medium as sold doesn't have it. And it clearly doesn't have the routing instructions because to take the analogy further, if a customer of WAS actually deployed the system and tried to make a plurality of application servers, the routing instructions between the main system and the plurality are not on the disk as IBM sells it. They couldn't be as a matter of logic because the disk doesn't know if you're going to set up a plurality of these things or not. So the routing instructions have to be created. And there's no dispute about this. Their expert agrees. The routing instructions get put into the WebSphere plug-in after the deployment of the application servers. They're created on site by the people installing the system, the customer. Later, they're not on the disk. These patents have expired, correct? They have, Your Honor. There's a second point that I want to make clear here, an entirely third independent reason why this should easily be summarily affirmed. Both of these patents, as Your Honor has already pointed out, these are web generation patents. They're for generating web pages. The WAAS system is not web page generating software. In fact, as we stand here today, discoveries over, expert discoveries over, the record is closed. They haven't pointed to not one, not one single web page that a WAAS customer ever generated. Not one. They don't have one. There is no opinion from their expert that a particular company bought WAAS, deployed it as they're supposed to do it, and set up a web page. In fact, they subpoenaed 30 IBM customers. They get to choose. They subpoenaed our top 30 customers. We've defined that the WAAS system is fully capable to create the web page and then the plurality of page servers. To what extent is the user participation, what's the level of expertise that would be required in order to take that next step? In this particular case, you need skilled IT people to install the system. But even beyond that, Your Honor, the instructions are not on the disk. The routing instructions in particular have to be created on site by the customer. They're not on the disk, so you can't find, let me rephrase, there's no evidence in the record that would allow you to find that the disk on its own contains what's necessary to get the job done. The district court found their proof by their expert, Dr. Jones, was insufficient to prove that there were routing instructions on the disk. That's on Appendix 7 in the court's opinion. That's a finding of fact. There's no evidence to the contrary that the routing instructions are on there at the time the disk is sold, and IBM doesn't put them on there. The customer has to create them after deployment. But getting back to the website point, which I think is really an important failing on the plaintiff's part here, there is not a single webpage that they put in the record that was created by a WASC customer. In fact, their expert, Dr. Jones, admitted the disk that's sold by IBM does not contain the instructions to create a website. This is critical because the claim element is that this source code is supposed to quote, I'm reading from the claim now, Claim 20, the disk is supposed to dynamically generate a webpage. Their expert, Dr. Jones, admitted the disk does not have webpage-generating instructions on it. It can't be done. The only way a WASC system can infringe under their theory is, number one, you have to set it out in the field. You have to deploy multiple application servers with a team of IT people. But then you have to buy third-party software that generates webpages. WASC is not a webpage-generating device of any kind. So you can't conclude, there's no evidence in the record to allow you to conclude, that WASC as it stands alone can generate a webpage. And that's a claim element. Their expert, Dr. Jones, admitted, and this is uncontested, that the disk as sold does not have the codes that can generate a webpage. That is the third independent reason why this case should be affirmed. So on the disk as sold by IBM, three major things are missing, and there's no evidence in the record. One is the routing instructions, and the court found that. One is the plurality of page servers or application servers, and the district court found that. Those are two fact findings. And then the ability to create a webpage does not exist in this software at all as sold. That's a third independent reason. Now, Mr. Cawley argued in his opening comments that that was waived. I'm not sure how we could argue that. It's a head note in our summary judgment brief as a third independent reason to dismiss this case. So on balance, there is, you know, essentially this should be a summary of affirmance for a failure of proof by this plaintiff, because WASC is not a web-generating software package. And on inducement and contributory, the district court found, again, definitively in the record, that Dr. Jones, their expert, did not give any substantive opinion that there are non-infringing uses of these products. When we see and use the term user here, what are we talking about? Are we talking about the posita? Are we talking about... When you say user? Yeah. When we say that there has to be user participation in order to make the WASC system infringing. I would say, yeah, in that particular case, you probably would need a posita, because you need a skilled IT professional to install the system. You know, these products are bought by people like Blue Cross Blue Shield, Fidelity, you know, companies of that nature. In these cases involving divided infringement, are we looking at that final step by a posita? This is not even divided infringement. Just to be clear, they have to purchase third-party software. This takes three people to infringe. IBM has to sell the product to Fidelity or Blue Cross Blue Shield. And if they want to make a webpage of it, they have to then go to a third... IBM doesn't sell this. They have to go to a third party and buy webpage-creating software and add that on, and then the customer has to put those two things together. But just to be clear, in this record, nobody does that. Right? We're done now. The record's closed. There is no evidence of a third party ever using this software to make a webpage. As I said, they subpoenaed 30 of our top customers. They came forward in their defense to summary judgment only with four of them. Cerner, Fidelity, Blue Cross Blue Shield of Alabama, and Blue Cross Blue Shield of Florida. And when we took the deposition of their expert on those four that he had in his opinion, we said, where in the materials do you show that they're using this to produce webpages? And he said, I can't prove that. I don't know that they were using these for webpages. Because they weren't. And we asked him, where is your limitation by limitation analysis on these four that they meet the claim? And he says, I didn't do that. So this is all in our brief. But as we stand here today, nobody has ever used WAAS to generate a webpage. So we don't even need to get to is it divided infringement or what's the standard. What we're asking ourselves here is, who's ever used this product to build a webpage? There's no proof of it. Right? And the record's closed. So what the district court found then on contributory infringement and inducement, just to finish out, again, their expert gave no rebuttal. IBM's expert put in detailed factual testimony and expert opinion about all the many uses of the accused features. And in response, all their expert said was, in words, that there's no non-infringing alternatives here. And the district court said, that is not a substantive opinion. I am not crediting that at all at the summary judgment stage. And that should be the ruling here, too. This should be a summary affirmance. Thank you, Your Honors. Okay. Thank you, Mr. Daniels. Mr. Caldy. Thank you, Your Honor. Just a few points. First of all, are there rounding instructions? Yes, they are. These days, if you produce summary judgment evidence that's too voluminous, you're accused of asking the court to scour the record. If it's too brief, you're accused of being conclusory. But I'm not going to bring the one that's voluminous. Here's the bullet shot. In this expert report, appendix, page 12, 819, the expert opines, after selection is complete, the WebSphere plug-in routes the request to said selected page server. As explained in section 2.1.1 above, that's the voluminous part, WebSphere executes, that is a specific reference to the source code, sends the request to the selected server. A similar statement is made by the same expert on page 12, 829, in paragraph 256 of his expert report. That, I respectfully submit, is in the summary judgment evidence and raises a fact issue about routing that makes summary judgment inappropriate, if that's the basis. On capability, during the course of argument on summary judgment, IBM admitted that their product is capable of making multiple page servers. Appendix, page 15.212, IBM's counsel says, this is a quote on slide 19 from their brief at 20. They say, the capability of deploying multiple application servers is present in the product. We don't dispute that. That's IBM's specific representation to the district court. But they don't dispute that their product is capable of producing multiple application servers, which the patent calls page servers. Now, if the issue is... So you're arguing capability again, but does the WAS software include the instructions to build the web pages? Yes, it includes instructions. I thought your expert acknowledged that the WAS system does not include all the instructions necessary to generate customers' web pages. It doesn't include weather forecast. It doesn't include the logo of the customer. We're not looking at weather forecast. But we are. That's why the expert says... Didn't your expert testify to that? Well, he didn't say web forecast. But if you look at all of that entire portion of his deposition... All of the instructions to generate the customer's web pages. Right. The customer has the desire to have many things on their web pages that's not generated by WAS. But the ability to build the structure, including a web page, including a web server and the page server, are in WAS. And that's in IBM's own documents and in the admission that I just made. And finally, in the last 30 seconds that I have available, the court obviously is struggling with the issue of... Well, you have some of these cases, Finjan and maybe even Fantasy Sports, where minimal activity is required by the customer. I urge the court on that issue, consult Versada versus SAP, where you will read a case. And I guess I should presume that the court has already read all of its own cases where substantial, complex effort was required by the customer to implement the machine-readable medium that they purchased from the defendant. But what the customer has to do, as long as it doesn't involve rewriting the software, is irrelevant. There was extensive customer activity in Versada, but all of the instructions were included. All the claim limitation instructions were included in Versada. Yes, the claim limitation instructions were included. I was just showing you where your own expert testified that the WAS system does not include instructions to build customer web pages. He says that it doesn't include them all. Okay. Thank you, Your Honor. Thank you. Thank you. Thank you, Mr. Collins, Mr. Moran. The case is taken under submission.